# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:10-CV-00185-M

LARRY MEHERG, *et al.*                                                                    PLAINTIFFS

V.

MICHAEL R. POPE and
CRETE CARRIER CORPORATION                                          DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on three motions filed by the Defendants: (1) a Motion for Partial Summary Judgment on the Plaintiffs' Punitive Damages Claims [DN 210]; (2) a Motion to Exclude, or Limit Testimony of, Three of the Plaintiffs' Expert Witnesses (Dr. Thomson, Dr. Czeisler, and Mr. Morgan) [DN 213]; and (3) a Motion to Exceed Reply-Brief Page Limitation [DN 223]. Also before the Court is the Plaintiffs' Motion to Exclude the Expert Testimony of Michael G. Ehrie, Jr. [DN 201]. Fully briefed, this matter is ripe for decision.

### I. BACKGROUND

This personal injury action arises from a motor vehicle accident that occurred on July 12, 2009. The undisputed evidence shows that the accident occurred on I-65 in Hart County, Kentucky, when a tractor-trailer driven by Michael R. Pope struck a stopped vehicle in the rear, causing that vehicle to collide with a second stopped vehicle. (See Police Report [DN 210-3] 1-2.) The second vehicle was occupied by the Plaintiffs: Larry Meherg, Aaron Meherg, and Kristin Shearer Meherg. They suffered various personal injuries in the accident. In total, as a result of the accident, five individuals were injured. Further, a six-year-old child was killed. (See id.)

On November 24, 2010, the Plaintiffs filed this action in state court, bringing negligence and gross negligence claims against Mr. Pope. (See Compl. [DN 1-1] § IV.) The Plaintiffs also

brought a respondeat superior claim, as well as a negligent hiring, training, and supervision claim, against Mr. Pope's employer, Crete Carrier Corporation ("Crete"). (See id. at §§ III, V.) The Defendants removed the action to this Court on diversity grounds. (Not. of Removal [DN 1].)

At the time of the accident, the weather was clear and dry. The speed limit at the accident site was seventy miles per hour. (See Police Report [DN 210-3] 1-2.) According to all accounts, Mr. Pope was driving under the speed limit. (See id.; Whitney Morgan Dep. [DN 210-6] 7.) Further, the Plaintiffs have not produced any evidence indicating that Mr. Pope was weaving or otherwise driving erratically. Instead, the evidence indicates that the opposite was true. One witness to the accident testified that to the best of her recollection, when she passed Mr. Pope's tractor-trailer before the accident, it was being operated in a safe manner. (See Chasidy Russell Dep. [DN 224-5] 12.)

The parties disagree on the accident's cause. According to the Defendants, the accident occurred because Mr. Pope failed to recognize that traffic was stopped due to construction on the road's surface. (See Defs.' Mem. [DN 210-2] 7.) In this respect, the Defendants rely on Mr. Pope's deposition testimony, where he stated that he moved from the right lane to the left lane when he noticed that traffic was backing up in the right lane. However, he did not recognize that traffic was also backing up in the left lane until it was too late to stop. (See Michael Pope Dep. [DN 210-16] 127-28.) The Defendants also highlight the testimony of a witness to the accident to corroborate this theory. She stated that after she passed Mr. Pope's tractor-trailer, traffic "suddenly stopped" and that in light of this "sudden halt," she was not surprised that Mr. Pope could not stop his truck in time to avoid a collision. (See Chasidy Russell Dep. [DN 224-5] 18.)

In contrast, the Plaintiffs offer several theories on the accident's cause. First, they argue that the accident occurred because Mr. Pope "should not have been on the road" because he "had not recovered from [an] illness that hospitalized him" and had not been medically re-certified to

drive. (Pls.' Resp. [DN 218] 3.) Second, the Plaintiffs argue that the accident occurred because

Mr. Pope was "also sleep deprived from pulling an 'all-nighter' 72 hours earlier . . . ." (Id.) Third, the

Plaintiffs argue that the accident occurred because Mr. Pope told Crete about his hospitalization

but Crete did not require him to seek medical re-certification. Fourth, the Plaintiffs argue that the

accident occurred because Crete failed to properly train its drivers on fatigue. (Id. at 12-15.)

The Defendants have admitted fault for the subject accident. (See Defs.' Mem. [DN 210-

2] 8.) This leaves two main issues to resolve: (1) the amount of compensatory damages to which

the Plaintiffs are entitled; and (2) whether the Plaintiffs can recover punitive damages. The

Defendants have moved for summary judgment on the punitive damages issue. (See Defs.' Mot.

for Partial Summ. J. [DN 210].) The Court will consider this motion below.

## II. The Defendants' Motion for Partial Summary Judgment on the Plaintiffs' Punitive Damages Claims [DN 210]

Before the Court may grant a motion for summary judgment, it must find that there is no

genuine dispute as to any material fact and that the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the

basis for its motion and identifying that portion of the record that demonstrates the absence of a

genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the

moving party satisfies this burden, the non-moving party thereafter must produce specific facts

demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving

party, the non-moving party must do more than merely show that there is some "metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986). The Federal Rules of Civil Procedure require the non-moving party to present

specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

In their complaint, the Plaintiffs seek punitive damages from Mr. Pope and Crete, arguing that their actions were "willful, wanton and/or reckless." (See Compl. [DN 1-1] § VII.) The Defendants have moved for summary judgment on these punitive damages claims, arguing that no clear and convincing evidence exists to prove that their conduct reached the level of gross negligence. (See Defs.' Mem. in Supp. of Mot. for Partial Summ. J. [DN 210-2] 9-23.) The Plaintiffs respond that they have presented sufficient evidence to survive the Defendants' motion.

Ky. Rev. Stat. § 411.184(2) states that a "plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." This standard can be met by producing evidence of a probative and substantial nature carrying sufficient weight to convince ordinarily prudent-minded people of its validity. See W.A. v. Cabinet for Health & Family Servs., 275 S.W.3d 214, 220 (Ky. App. 2008). The Sixth Circuit has held that "where the nonmoving party faces a heightened burden of proof, such as clear and convincing evidence, he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard." White v. Turfway Park Racing Ass'n, Inc., 909 F.2d 941, 944 (6th Cir. 1990), *overruled on other grounds*, Salve Regina College v. Russell, 499 U.S. 225 (1991).

In Williams v. Wilson, the Kentucky Supreme Court found that the statute's requirement of "malice" is unconstitutional. 972 S.W.2d 260 (Ky. 1998). In so doing, it held that to impose punitive damages, conduct must amount to at least common-law "gross negligence." Id. In Horton v.

Union Light, Heat & Power Co., the Kentucky Supreme Court explained this standard, noting that to justify punitive damages, "there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'" 690 S.W.2d 382, 389–90 (Ky. 1985).

In this case, the Court will first analyze whether the Plaintiffs have presented sufficient evidence to justify the imposition of punitive damages on Mr. Pope. It will then analyze whether they have presented sufficient evidence to justify the imposition of punitive damages on Crete.

### A. MR. POPE

**Mr. Pope's Driving History and Medical Condition.** In 1991, Mr. Pope started driving for a predecessor company to Crete. Until the subject accident, he had driven over two million miles without a chargeable or preventable accident. He had also received various safety awards. (See Whitney Morgan Dep. [DN 210-6] 17-18.) While Mr. Pope suffers from Chronic Obstructive Pulmonary Disease ("COPD"), he had disclosed this condition to the Department of Transportation. (See, e.g., May 5, 2009 Med. Exam. Report [DN 210-8].) Further, despite having COPD, Mr. Pope had passed all of his biennial Commercial Driver Fitness Determinations, including one on May 5, 2009—two months before the subject accident. (See id.) The Commercial Driver Fitness Determination on May 5, 2009 gave Mr. Pope a two-year medical certificate. According to it, Mr. Pope was medically qualified to drive a truck and had "no limitations." (Id.)

On June 25, 2009, Mr. Pope was hospitalized for acute exacerbation of his COPD. (See Dr. Michael G. Ehrie, Jr. Report [DN 210-10] 4; Michael Pope Dep. [DN 210-15] 38, 54-58.) He was discharged two days later, on June 27, 2009. Mr. Pope was given a sixteen-day tapering dose of Prednisone and a five-day course of antibiotics. After his hospitalization, he took a vacation. He was on vacation until July 7, 2009—five days before the subject accident. (Id.)

**Re-Certification.** The Plaintiffs argue that before returning to work on July 7, 2009, Mr. Pope was required to seek medical re-certification from the Department of Transportation. (See Pls.' Resp. [DN 218] 3, 5-6.) This argument is based on their interpretation of 49 C.F.R. § 391.45, which requires medical re-certification from "[a]ny driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease." 49 C.F.R. § 391.45(c). According to the Plaintiffs, this regulation requires drivers to be re-certified after an impairing illness—even if the driver is able to perform his/her normal duties after recovery. Thus, the Plaintiffs argue that since Mr. Pope was impaired when he was hospitalized on June 25, 2009, he should have been re-certified before returning to work. (See Pls.' Resp. [DN 218] 3, 5-6.)

The Defendants counter that Mr. Pope was not required under 49 C.F.R. § 391.45 to seek medical re-certification after his hospitalization, as he had recovered from his acute exacerbation of COPD and returned to his baseline health. (See Defs.' Reply Mem. [DN 222] 3-8.) They argue that the Department of Transportation indicates that drivers returning from illnesses are **not** required to undergo re-certifications if their current medical certificates have not expired—"unless the injury or illness has impaired the driver's ability to perform his/her normal duties." See 62 F.R. 16370-01, at *16411-12. According to the Defendants, Mr. Pope's ability to perform his duties was not impaired upon leaving the hospital, as his COPD was no longer exacerbated. (See Discharge Summ. [DN 224-8] (discharging Mr. Pope from the hospital with no work restrictions, but instructing him to follow-up with a pulmonologist and the discharging physician in two or three weeks).) Thus, the Defendants argue that Mr. Pope was not required to be re-certified before returning to work. The Defendants argue that the regulation's intent is not to require re-certification after every illness that causes a driver to miss work. (Defs.' Reply Mem. [DN 222] 5-7.)

Regardless, the evidence shows that Mr. Pope did not seek medical re-certification from the Department of Transportation. Instead, he simply returned to work on July 7, 2009.

**July 8, 2009 and July 9, 2009.** On July 8, 2009, Crete dispatched Mr. Pope to an Atlas Cold Storage facility in Piedmont, South Carolina, to pick up a load of freight. (See Michael Pope Dep. [DN 210-11] 222.) He arrived at 12:40 p.m. (Id.) However, Mr. Pope's tractor-trailer was not loaded until nearly midnight, after eleven hours had passed. (See id. at 229.) In his log book, Mr. Pope logged this eleven-hour period as "uninterrupted rest." (Id. at 228.) Essentially, this reset his duty clock—meaning that he could work an additional fourteen hours before receiving another rest period. (See Pls.' Resp. [DN 218] 9.)[1] Mr. Pope went on to drive all night, delivering the load on July 9, 2009. (See Michael Pope Dep. [DN 210-11] 229.)

In his deposition, Mr. Pope stated that while he was waiting for his truck to be loaded, during his "uninterrupted rest" time, he received "some sleep but not what you call quality sleep," as he was "getting it in naps." (Id. at 227.) The electronic messages sent between Mr. Pope and the dispatcher seem to support that Mr. Pope was napping, as there were two lengthy periods of non-communication. Specifically, Mr. Pope did not communicate with the dispatcher between 12:40 p.m. and 3:40 p.m. or between 5:51 p.m. and 11:02 p.m. (See Qualcomm Messages [DN 210-14].) The Plaintiffs argue, however, that these naps of non-quality sleep were insufficient to reset Mr. Pope's duty clock. According to the Plaintiffs, as a result, Mr. Pope worked an "all-nighter" on July 8, 2009, consisting of twenty-four hours with no sleep. (See Pls.' Resp. [DN 218] 7.)

Further, the Plaintiffs argue that Mr. Pope felt forced to work this all-nighter because he had previously refused to accept freight and had been told by a dispatcher that he could be fired for such refusals. (See Michael Pope Dep. [DN 218-13] 209-10.) In support of this position, the Plaintiffs highlight various messages that Mr. Pope sent the dispatcher while waiting for freight

---

[1] The regulation at issue requires truck drivers to take "10 consecutive hours off duty" before driving. 49 C.F.R. § 395.3(a)(1). However, the regulation does not require drivers to sleep while off duty. It merely requires drivers to take an off-duty break between shifts. See Cast N. Am. (Trucking) Ltd. v. N.L.R.B., 207 F.3d 994, 998-99 (7th Cir. 2000).

to be loaded on July 8, 2009. In one message, when discussing with the dispatcher how long the delay would last, Mr. Pope stated "I just do what I got to do." (Michael Pope Dep. [DN 210-11] 223.) In another message, in response to the dispatcher's message to keep things "safe and legal always," Mr. Pope stated "there's nothing safe about this one." (See Satellite Messages [DN 218-15].) The Plaintiffs argue that these messages show that Mr. Pope should not have driven on July 8, 2009. They also argue that the messages show that Mr. Pope falsely indicated that he received eleven hours of "uninterrupted rest"—both to make his log book "appear legal" and to appease Crete. According to the Plaintiffs, Mr. Pope was sleep-deprived on July 8, 2009. However, he delivered the freight because he was afraid of retaliation. (See Pls.' Resp. [DN 218] 8-10.)

In any event, the undisputed evidence is that the accident did not occur when Mr. Pope was delivering the freight on July 8, 2009. Instead, it occurred seventy-two hours later—on July 12, 2009. Nevertheless, the Plaintiffs still rely on these facts regarding Mr. Pope's "all-nighter" to argue that he was sleep-deprived on July 12, 2009. (Pls.' Resp. [DN 218] 3.)

**Sleep-Deprivation.** In his deposition, Mr. Pope stated that he was not tired on July 12, 2009. (See Michael Pope Dep. [DN 210-16] 118.) Despite this statement, the Plaintiffs argue that Mr. Pope had not recovered from the all-nighter that occurred seventy-two hours earlier—and that the accident occurred due to sleep-deprivation. As evidence of his alleged sleep-deprivation, the Plaintiffs note that one second before the impact, Mr. Pope had not hit the brakes of his tractor-trailer. (See Engine Comp. Data [DN 218].) As further evidence, the Plaintiffs point to the fact that Mr. Pope was on I-65 when the accident occurred. According to the Plaintiffs, I-65 was not the "shortest and best" route from Rossville, Tennessee to Wilmington, Illinois. Thus, the jury could conclude that "fatigue and confusion put him on the wrong route" and that by the time he realized his mistake, back-tracking was "no longer an option . . . ." (Pls.' Resp. [DN 218] 15-16.)

The Plaintiffs also argue that "[m]ultiple errors and omissions in his last three days of logs suggest a deep lethargy . . . ." (Id. at 10.) For example, the Plaintiffs state that on his first trip after the all-nighter, on July 10, 2009, Mr. Pope "overslept, drove three exits past the destination, falsified his log, and stopped communicating with dispatchers for ten hours." (Id. at 11 (citing Driving Log from July 10, 2009).) They also state that the next day's log is "replete with errors, omissions, and falsifications." (Id. (citing Driving Log from July 11, 2009).) Finally, the Plaintiffs suggest that Mr. Pope carried a fake log book. In support of this theory, they note that on the day of the accident, the activity portion of Mr. Pope's log is completely blank, (Driving Log from July 12, 2009), but a Kentucky State Police Commercial Vehicle Enforcement officer stated that the log Mr. Pope showed him was not blank. (See Steve Burke Affidavit [DN 219-7].)

In response to the Plaintiffs' sleep-deprivation argument, the Defendants argue that Mr. Pope was well-rested. (See Defs.' Reply Mem. [DN 222] 8-11.) The Defendants highlight that the record shows that Mr. Pope had taken full ten-hour breaks on July 9, 2009; July 10, 2009; and July 11, 2009—the three nights preceding the accident. (See Whitney Morgan Dep. [DN 210-7] 126.) They also highlight that on the morning of July 12, 2009, Mr. Pope had eaten brunch with his brother and sister-in-law, who both stated that that he did not appear to be sleepy, drowsy, or tired. (See William M. Pope, Jr. Affidavit [DN 226-4]; Carolyn Ann Pope Affidavit [DN 226-5].) Further, Mr. Pope stated that he was not tired on July 12, 2009. (See Michael Pope Dep. [DN 210-16] 118). According to the Defendants, Mr. Pope was simply not sleep-deprived when the accident occurred.

In addition, the Defendants highlight that Mr. Pope had slept roughly eight hours per night on sixteen of the seventeen nights preceding his accident. (See Michael Pope Affidavit [DN 224-1].) Also, the Defendants note that the Plaintiffs' own experts have indicated that two or three nights of sleep will return an individual to his/her baseline values on cognitive performance.

(See Charles Czeisler Dep. [DN 224-4] 28 (noting that for a "healthy young person" who has been sleep-deprived, "most measures of cognitive performance will have returned to baseline values" within two nights of "unrestricted access to sleep"); see also Douglas Thomson Dep. [DN 224-3] 72-73 (noting that if a person has an "acute sleep debt" missing one night's sleep, two or three nights of reasonable sleep eight hours in length would probably repay that debt).) According to the Defendants, there is insufficient evidence in the record to show sleep-deprivation.

Finally, as to the Plaintiffs' arguments concerning Mr. Pope's log books, the Defendants note that they do not evidence any "deep lethargy." (See Defs.' Reply Mem. [DN 222] 16-17.) First, according to the Defendants, while there are admittedly mistakes in Mr. Pope's log books (particularly with math-related calculations), that does not change the fact that Mr. Pope received adequate rest in the days before the accident. Second, while the Defendants maintain that there was no fake log book, they argue that even if there was such a log book, the tractor-trailer's GPS information shows that Mr. Pope took legal ten-hour breaks on July 9, 2009; July 10, 2009; and July 11, 2009. Third, the Defendants state that the Plaintiffs' argument is flawed due to internal inconsistency, as the Plaintiffs simultaneously argue that Mr. Pope was clear-headed enough to purposefully falsify his log book and maintain a fake log book despite the fact that he was deeply lethargic. Fourth, the Defendants state that the Plaintiffs' argument is flawed since it is illogical, as any fake log book would be no match for a GPS device. (See id.)

**Doxylamine.** Lastly, the Plaintiffs argue that Mr. Pope "might have been taking Doxylamine and so might have been drowsy." (Pls.' Resp. [DN 218] 18.) This argument is based on a photograph that was taken inside Mr. Pope's truck after the accident. The photograph shows a bottle that "may be Tylenol cold medicine, which contains Doxylamine" and "causes drowsiness . . . ." (Id.) According to the Plaintiffs, Mr. Pope was not questioned about taking Doxylamine on the day of the accident because the photograph was not discovered until after his deposition. The Plaintiffs

propose that evidence "must be developed at trial" before it will be known whether Doxylamine caused Mr. Pope to be drowsy. Further, the Plaintiffs suggest that the evidence was somehow "tampered with," as Crete states that it "does not now have possession" of the bottle. (Id.)

The Defendants counter that this argument is pure speculation that should be rejected. (See Defs.' Reply Mem. [DN 222] 21.) According to the Defendants, the Plaintiffs have produced no evidence to support their claim that Mr. Pope was taking Doxylamine on July 12, 2009. Further, the Defendants note that evidence cannot now be gathered, as discovery has closed. (See id.)

**Punitive Damages Analysis.** The Defendants argue that based on the above facts, the Court must dismiss the Plaintiffs' punitive damages claim against Mr. Pope. More precisely, they argue that the Plaintiffs have failed to produce clear and convincing evidence to support a finding that Mr. Pope was grossly negligent. (See Defs.' Mem. [DN 210-2] 9-23.) In support of this argument, the Defendants cite Kinney v. Butcher, in which the Kentucky Court of Appeals declined to authorize punitive damages despite the fact that a driver was "traveling at a possible speed of ten miles per hour in excess of the posted speed limit" when he failed to complete a pass before entering a no-passing zone. 131 S.W.3d 357, 359 (Ky. App. 2004). In Kinney, the Court emphasized:

> Were we to accept Kinney's argument that [speeding and trying to pass in a no passing zone] amounts to wanton or reckless disregard for the safety of others, it would effectively eliminate the distinction between ordinary and gross negligence in the context of automobile accidents. Nearly all auto accidents are the result of negligent conduct, though few are sufficiently reckless as to amount to gross negligence, authorizing punitive damages. We are of the opinion that punitive damages should be reserved for truly gross negligence . . . .

Id. In this case, the Defendants argue that a similar conclusion is warranted because Mr. Pope's allegedly negligent conduct of driving while tired, without medical re-certification, does not amount to wanton or reckless disregard for the safety of others. According to the Defendants, a contrary holding would effectively eliminate the distinction between ordinary and gross negligence.

The Court begins by noting that the Plaintiffs' alleged causes of the accident are highly speculative. Indeed, while the Plaintiffs attempt to show that Mr. Pope was sleep-deprived on July 12, 2009, a thorough review of the evidence reveals that the case is devoid of circumstances from which it can be reasonably inferred that the accident occurred because Mr. Pope was tired.

In this respect, the Court first questions whether the Plaintiffs' proffered evidence even supports a finding that Mr. Pope pulled an all-nighter on July 8, 2009. As discussed above, Mr. Pope stated in his deposition that he took naps in his tractor-trailer while waiting for his freight on July 8, 2009. This statement is corroborated by the lengthy timing gaps that appear between the messages that were sent from Mr. Pope to the dispatcher. Contrary to the Plaintiffs' assertion, it does not seem that Mr. Pope worked twenty-four hours with no sleep.

Further, even if Mr. Pope could be deemed to have pulled an all-nighter on July 8, 2009, the evidence indicates that he took legal ten-hour breaks on July 9, 2009; July 10, 2009; and July 11, 2009—the three days preceding the accident. Mr. Pope stated that he was not tired on July 12, 2009. (Michael Pope Dep. [DN 210-16] 118). In fact, he had slept roughly eight hours per night on sixteen of the seventeen nights before the accident. (See Michael Pope Affidavit [DN 224-1].) Also, on the morning of July 12, 2009, Mr. Pope ate brunch with his brother and sister-in-law, who both stated that that he did not appear to be sleepy, drowsy, or tired. (See William M. Pope, Jr. Affidavit [DN 226-4]; Carolyn Ann Pope Affidavit [DN 226-5].) This evidence, in conjunction with the testimony of the Plaintiffs' experts (who have indicated that two or three nights of sleep will return an individual to his/her baseline values on cognitive performance), strongly suggests that Mr. Pope was not tired on July 12, 2009. Neither Mr. Pope's alleged log book mistakes nor his alleged consumption of Doxylamine overcome these facts. The Plaintiffs have failed to produce clear-and-convincing evidence that Mr. Pope was tired on July 12, 2009.

However, even if the Court were to assume that Mr. Pope was tired when he wrecked from pulling an "all-nighter" three days earlier, the Court finds that driving while tired does not match the level of culpability in cases where punitive damages are available. Under Kentucky law, punitive damages are reserved for conduct that truly constitutes gross negligence. For example, Kentucky courts have found that punitive damages are warranted when a driver is intoxicated. See Shortridge v. Rice, 929 S.W.2d 194, 198 (Ky. App. 1996). They have also found that punitive damages are warranted when there are several instances, or egregious instances, of misconduct. See Phelps v. Louisville Water Co., 103 S.W.3d 46, 52 (Ky. 2003) (noting that a jury could find gross negligence when there were eighteen instances of misconduct, including several misrepresentations, violations of the company's internal policies, failures to notify the proper entities, and improper conduct at the work zone); see also Gersh v. Bowman, 239 S.W.3d 567, 572 (Ky. App. 2007) (noting that a jury could find gross negligence when the driver was traveling at least twenty-four miles per hour over the speed limit for the road, and at least thirty-four miles per hour more than the speed limit for the curve, with two passengers in his vehicle, when it was dark outside, and when the driver's passenger warned the driver of the upcoming curve in the road and the driver said "yeah, I got it"). The facts here do not rise to such a level.

In the present case, Mr. Pope was traveling under the speed limit, without any suggestion of intoxication, and without a prior history of accidents. He had no passengers in his vehicle. The weather was clear and dry. The Plaintiffs have not produced any evidence indicating that Mr. Pope was weaving or otherwise driving erratically prior to the accident. Based on these facts, the Court concludes that Mr. Pope's conduct did not rise to the level of gross negligence.

This conclusion is supported by other decisions. For example, in Turner v. Werner Enters., Inc., Judge Hood held that knowingly driving while tired and causing a crash after falling asleep does not constitute gross negligence. 442 F. Supp. 2d 384, 386-87 (E.D. Ky. 2006). Here, it seems

to the Court that a similar conclusion is warranted. Even if Mr. Pope pulled an all-nighter and was still tired from it three days later, <u>Turner</u> indicates that this conduct falls short of the gross negligence standard. Further, while the Plaintiffs put much weight on the fact that Mr. Pope had not hit the brakes of his tractor-trailer one second before the impact, the Court finds that this failure only shows that he was not paying attention to the road—or that he failed to see the stopped vehicles in time to apply the brakes. This does not support an award of punitive damages. <u>See</u> <u>Batts v. Crete Carrier Corp.</u>, 2009 WL 6842545, at *2 (N.D. Ga. Dec. 14, 2009) (reaching the same conclusion under Georgia law, which also requires clear and convincing evidence to support an award of punitive damages).

The Court notes that in the Plaintiffs' response memorandum, the Plaintiffs argue that the above-cited cases are "immaterial" to the punitive damages question since the case is based on more than the fact that Mr. Pope "fell asleep and rear-ended traffic." (<u>See</u> Pls.' Resp. [DN 218] 20-21.) The Plaintiffs then proceed to argue that their punitive damages claims are based on "multiple instances of reckless conduct and <u>patterns</u> of reprehensible behavior that made harm foreseeable." (<u>Id.</u> at 21.) The Plaintiffs follow by discussing Crete's alleged failure to train—and alleged failure to supervise their drivers and dispatchers. (<u>See</u> <u>id.</u> at 21-23.) However, the Court finds that as to the Plaintiffs' punitive damages claim **against Mr. Pope**, the above-cited cases are material. Therefore, the Defendants' summary judgment motion is **GRANTED** on this claim.

The Court's conclusion does not change in light of the Plaintiffs' argument that Mr. Pope was required to seek medical re-certification after his hospitalization. In this respect, the Court first questions whether 49 C.F.R. § 391.45 even required Mr. Pope to seek re-certification. It seems to the Court that while Crete might have had a duty to examine Mr. Pope and ensure that he was healthy enough to drive, the regulation's intent is **not** to require re-certification after every illness that causes a driver to miss work. <u>See</u> 62 F.R. 16370-01, at *16411-12. In any event, the Court

finds that this issue is irrelevant to the Plaintiffs' punitive damages claim. In this respect, the Court relies on <u>Estate of Embry v. GEO Transportation of Indiana, Inc.</u>, 478 F. Supp. 2d 914 (E.D. Ky. 2007) and <u>Spaulding v. Tate</u>, 2012 WL 3845411 (E.D. Ky. Sept. 5, 2012).

In <u>Estate of Embry</u>, the plaintiffs were injured when the driver of a tractor-trailer choked on coffee, passed out, crossed the median, and hit the plaintiffs' oncoming vehicle. 478 F. Supp. 2d at 916-17. The plaintiffs took a broad view on what was relevant to their punitive damages claim—arguing that the Court should consider the driver's "course of conduct" before the accident. <u>Id.</u> at 922. Specifically, the plaintiffs offered "voluminous evidence dating back as far as 1975 of various physical ailments and illnesses suffered by [the driver], such as neck and back problems; knee problems; smoking-related bronchitis; carpal tunnel syndrome; and obesity." <u>Id.</u> They then argued that the driver "fraudulently omitted various aspects of this medical history when he applied for his job . . . and when he submitted medical information in order to obtain a commercial driving license." <u>Id.</u> In essence, the plaintiffs raised the same argument that the Plaintiffs assert here: namely, that they should receive punitive damages since the driver should not have been driving.

However, Judge Bertelsman found that this evidence did not support the plaintiffs' punitive damages claim. <u>Id.</u> at 921-24. He held that there was no "proximate 'nexus' between [the accident] in Kentucky and [the driver's] extraterritorial failure to report accurately his whole medical history to his employers and to the doctors who, upon examining him in person, found him fit to hold a commercial driver's license." <u>Id.</u> at 923. He also found that the Plaintiffs had adduced "only speculation" that there was any cause other than the driver's choking on coffee. <u>Id.</u> at 923 n.10.

Similarly, in <u>Spaulding</u>, Judge Reeves ruled that no punitive damages were available to a plaintiff who was hit by a tractor-trailer because "the violation of a statute establishing rules of the road does not constitute gross negligence or willful or wanton conduct sufficient to support an award of punitive damages." 2012 WL 3845411, at *6 (E.D. Ky. Sept. 5, 2012). In that case,

the plaintiff pointed to eight alleged violations of state and federal law as evidence that the driver of the tractor-trailer was grossly negligent. Id. However, the Court held that the plaintiffs had not shown that these violations had anything to do with causing the subject accident. Id.

Here, a similar conclusion is warranted. As in Estate of Embry and Spaulding, there is simply no correlation between the Plaintiffs' alleged failure to seek medical re-certification and the subject accident. While the Plaintiffs speculate that Mr. Pope was unfit to drive on July 12, 2009, it is clear that he was discharged from the hospital fifteen days earlier, on June 27, 2009, with nothing more than instructions to follow-up with a pulmonologist and the discharging physician in two or three weeks. (Discharge Summ. [DN 224-8].) Contrary to the Plaintiffs' position, the discharge summary in no way indicated that the follow-up visits should occur prior to Mr. Pope's returning to work. Further, the Plaintiffs have offered no evidence that Mr. Pope was sick on the day of the accident—or that his COPD was exacerbated on that date, causing him to have an accident.

Instead, it appears to the Court that the Plaintiffs have, at most, suggested that Mr. Pope's hospitalization contributed to the accident because he took his last dose of Prednisone on July 12, 2009. According to the Plaintiffs, without a strong dose of this steroid, "his lethargy increased and his alertness deteriorated as he worked his way to Kentucky." (Pls.' Resp. [DN 218] 26.) However, as noted above, even if this were true, knowingly driving while tired cannot support a punitive damages award. The Plaintiffs have failed to provide evidence linking Mr. Pope's act of failing to get medically re-certified to his conduct on July 12, 2009. Thus, the Court holds that in this case, the alleged violation of the federal regulation does not support a finding of gross negligence. As a matter of law, the Defendants are entitled to summary judgment.

## B. Crete

**Failure-to-Train.** The Plaintiffs argue that the accident occurred, in part, because Crete was negligent in training its drivers on fatigue. This argument is largely based on an allegedly

"identical" accident that occurred in Florida in 2006. That accident involved another one of Crete's tractor-trailer drivers. (See Pls.' Resp. [DN 218] 3.) There, the driver rear-ended traffic that was stopped for a school bus. In total, seven children were killed. (Hwy. Accident Brief, http://www.ntsb.gov/doclib/reports/2008/HA0805.pdf.) The National Transportation Safety Board found that the driver rear-ended traffic because he failed "to maintain alertness due to fatigue from obtaining inadequate rest." (Id.) The evidence showed that with the exception of a two-hour sleep period in the morning and one or two hours of rest, the driver was awake for about thirty hours. Also, it had been thirty-four hours since his last substantial off-duty period. (Id.)

As a result of this Florida accident, Crete proposed a corrective Safety Management Plan, indicating that it would train its drivers on "[t]ime management while on and off duty, including fatigue and wellness education." (See Safety Mgmt. Plan [DN 218-4].) The Plaintiffs now argue that Crete failed to comply with this plan because "instead of using a nationally recognized driver training firm . . . the company recorded a homemade training video" taught by Raymond Coulter, the Vice President of Safety and Compliance at Crete. (See Pls.' Resp. [DN 218] 4.) According to the Plaintiffs, such training was inadequate because Mr. Coulter is not trained on fatigue—and because his lecture "did not even mention the regulation that prohibits driving while impaired or even likely to become impaired by fatigue or illness." (Id. at 5 (emphasis in original).) In support, the Plaintiffs cite the testimony of Dr. Charles Czeisler, who opines that the training Mr. Coulter gave was inadequate due to his "minimal knowledge of the safety risks associated with fatigue in the trucking industry." (See Charles A. Czeisler Report [DN 218-7] 27-30, 46-50.)

The Defendants counter that the Florida accident is irrelevant to the current case—as Mr. Pope was not faced with similar circumstances on July 12, 2009. The Defendants highlight that while the driver in the Florida accident had only a couple hours of sleep in the hours prior to the accident, Mr. Pope slept roughly eight hours per night on sixteen of the seventeen nights preceding

his accident. (See Michael Pope Affidavit [DN 224-1].) Further, while it had been thirty-four hours since the driver in the Florida accident had taken a substantial off-duty period, Mr. Pope had taken legal ten-hour breaks on July 9, 2009; July 10, 2009; and July 11, 2009—the three days preceding the subject accident. The Defendants also argue that the Plaintiffs have failed to show that Crete failed to properly implement the Safety Management Plan. In this respect, the Defendants state that there is no evidence that the government has criticized their actions. (See Defs.' Reply Mem. [DN 222] 18.)

**Failure-to-Supervise.** The Plaintiffs also criticize Crete for allowing Mr. Pope to drive without medical re-certification. (See Pls.' Resp. [DN 218] 7.) In this respect, the Plaintiffs focus on the fact that Mr. Pope stated that he informed Rae Ashley, his Terminal Manager, that he had been hospitalized. (See Michael Pope Dep. [DN 218-11] 58.) According to the Plaintiffs, upon learning of Mr. Pope's hospitalization, Ms. Ashley should have kept Mr. Pope off the road until he was medically re-certified. Again, the Plaintiffs base this argument on 49 C.F.R. § 391.45.

The Defendants counter that under 49 C.F.R. § 391.45, Mr. Pope was not required to seek medical re-certification. Further, the Defendants highlight that according to Ms. Ashley, Mr. Pope never told her about his hospitalization. (See Rae Ashley Dep. [DN 218-12] 93.)

**Mutual-Assistance Pact.** Lastly, the Plaintiffs argue that Mr. Pope and Crete had an agreement in which Mr. Pope agreed "to conceal incriminating evidence" about Crete, and Crete promised to lie to Mr. Pope's prospective employers about the nature of the accident. (See Pls.' Resp. [DN 218] 15-16.) While this argument is somewhat difficult to discern, the Plaintiffs seem to suggest that Mr. Pope agreed to state that he took I-65 on the day of the accident so that he could have brunch with his brother and sister-in-law to cover up the fact that Crete ordered Mr. Pope to take I-65, thereby making "a known safety problem even worse by dispatching the impaired driver . . . ." (See id. at 16.) The Plaintiffs suggest that in exchange, Crete agreed to lie to Mr.

Pope's prospective employers, telling them that no one was killed or injured in the subject accident. (See id. at 15 (citing Emp't Ver. Form [DN 219-11] 1).)

The Defendants respond that this argument lacks evidentiary support. According to them, the evidence shows that on the morning of the accident, Mr. Pope stopped to have brunch with his brother and sister-in-law. (See William M. Pope, Jr. Affidavit [DN 226-4]; Carolyn Ann Pope Affidavit [DN 226-5].) From there, Mr. Pope took I-65 toward Wilmington, Illinois. According to the Defendants, this route made sense. While it was thirty-seven miles longer than the route the Plaintiffs argue that Mr. Pope should have taken, the I-65 route only takes nineteen minutes longer to drive and is all interstate. (See Defs.' Reply Mem. [DN 222] 19.)

Also, the Defendants argue that there is an even larger hole in the Plaintiffs' argument, as it is based on the premise that Crete's part of the pact was to falsify an Employment Verification Form—and thus trick Mr. Pope's prospective employers into believing that there were no injuries or deaths in the subject accident. According to the Defendants, this argument fails for two reasons. First, while Crete did not list the fatality and injuries on the Employment Verification Form, it did disclose the subject accident. (See Emp't Ver. Form [DN 219-11] 1.) At that point, prospective employers could have searched for information on the accident and discovered its true nature. (See Defs.' Reply Mem. [DN 222] 20.) Second, Mr. Pope disclosed the subject accident on his employment application and stated that it involved a fatality and five injuries. (Driver's Appl'n for Emp't [DN 226-9] MT22.) The Defendants assert that due to this disclosure, it strains credibility for the Plaintiffs to argue that Mr. Pope bargained for Crete to lie to his prospective employers.

**Punitive Damages Analysis.** The Plaintiffs argue that based on the above facts, they are entitled to punitive damages from Crete—and the Court should accordingly deny the Defendants' summary judgment motion on this issue. The Plaintiffs' argument seems to be based on the belief that Crete was reckless because it failed to properly train its drivers on fatigue—and

also failed to supervise its dispatchers, which led to "impaired" drivers being on the road. (See Pls.' Resp. [DN 218] 20-24.) The Plaintiffs cite Horton v. Union Light, Heat & Power Co. in support of their position that an employer may be grossly negligent, and liable for punitive damages, for failing to train employees on safety procedures. 690 S.W.2d 382, 390 (Ky. 1985). According to the Plaintiffs, "[i]f Crete had taken to heart the lessons of the school bus crash and fulfilled its promise to train drivers about fatigue, it would have effectively immunized itself against punitive damages liability for this repeat rear-end collision due to fatigue." (Pls.' Resp. [DN 218] 23.)

The Court, however, disagrees with the Plaintiffs and finds they have failed to offer clear and convincing evidence that Crete was reckless. As an initial matter, as noted above, the case is devoid of circumstances from which it can be reasonably inferred that the accident happened because Mr. Pope was sleepy. Therefore, any alleged failure to train on fatigue is irrelevant. The Plaintiffs have not demonstrated a causal nexus between any alleged failure to train on fatigue and the subject accident on July 12, 2009. Similarly, as discussed above, the Plaintiffs have failed to provide evidence linking Mr. Pope's act of failing to get medically re-certified to his conduct on July 12, 2009. As such, the Court finds that any alleged failure to supervise dispatchers is irrelevant. The Plaintiffs have not demonstrated the requisite causal nexus. Their punitive damages claim has no merit.

In this respect, the Court notes that it agrees with the Defendants that the Florida accident is inapposite to the current case—and has no bearing on it. As the Defendants correctly highlight, Mr. Pope was not faced with similar circumstances on July 12, 2009. While the driver in the Florida accident had only a couple hours of sleep in the hours before the accident, Mr. Pope slept roughly eight hours per night on sixteen of the seventeen nights preceding his accident. (Michael Pope Affidavit [DN 224-1].) Further, while it had been thirty-four hours since the driver in the Florida

accident had taken a substantial off-duty period, Mr. Pope had taken legal ten-hour breaks on July 9, 2009; July 10, 2009; and July 11, 2009—the three days preceding the subject accident.

In addition, the Court notes that it agrees with the Defendants that the Plaintiffs' mutual assistance pact argument lacks evidentiary support. It is pure speculation. The argument is based on the premise that Crete's part of the pact was to falsify an Employment Verification Form— and thus trick Mr. Pope's prospective employers into believing that there were no injuries or deaths in the subject accident. However, this argument fails since Mr. Pope disclosed the accident on his employment application and stated that it involved one fatality and five injuries. (Driver's Appl'n for Emp't [DN 226-9] MT22.) Due to this disclosure, it strains credibility for the Plaintiffs to argue that Mr. Pope bargained for Crete to lie to his prospective employers. The Defendants' summary judgment motion is **GRANTED** on the Plaintiffs' punitive damages claim against Crete.

To the extent that the Plaintiffs argue that they are entitled to punitive damages as a result of Mr. Pope's conduct, their argument also fails. Ky. Rev. Stat. § 411.184(3) expressly limits the imposition of punitive damages against an employer for the negligence of its employee. It states:

> In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question.

Id. To satisfy these requirements, it would be incumbent on the Plaintiffs to introduce evidence that one or more of Crete's representatives "authorized or ratified or should have anticipated" Mr. Pope's acts. See Carter v. Builders Transp., Inc., 812 F. Supp. 97, 99 (W.D. Ky. 1992) (holding that punitive damages could not be assessed against the truck driver's employer because nothing indicated that the employer "in anyway authorized, ratified, or should have anticipated the complained of behavior"); Turner, 442 F. Supp. 2d at 387 (reaching the same conclusion). Here, the Plaintiffs seem to argue that Crete should have anticipated the accident because Mr.

Pope was not medically re-certified after being hospitalized for acute exacerbation of his COPD and because he was sleep-deprived. The Court, however, disagrees with this argument.

In McGonigle v. Whitehawk, Judge Russell discussed the imposition of punitive damages against an employer. 481 F. Supp. 2d 835, 841 (W.D. Ky. 2007). In so doing, he noted that for the plaintiffs to recover punitive damages against the employer, they had to demonstrate "that not only did [the employee] act grossly negligent during the scope and course of his employment . . . but also that [the employer] either authorized or should have anticipated [the employee's] wrongful conduct." Id. Judge Russell went on to deny a punitive damages claim against an employer after its allegedly intoxicated employee rammed into the rear of a motorists' vehicle, despite the fact that the employer knew that its employee had two prior convictions for driving under the influence. Id. at 841–42. He noted that these instances had occurred six and one half years prior to the incident. The instances did not qualify as an inappropriate pattern of conduct. Id.

Here, the Court likewise concludes that despite the fact that Crete might have known that Mr. Pope was hospitalized on June 25, 2009, and despite the fact that Crete might have known that Mr. Pope received little sleep on July 8, 2009, there is no evidence that the accident was caused by Mr. Pope's COPD or lack of sleep. Likewise, there is no evidence that Crete should have anticipated that Mr. Pope's COPD or alleged sleepiness would lead to the accident in question. Before the subject accident, Mr. Pope had driven over two million miles without a chargeable or preventable accident—let alone an accident caused by his COPD or any sleepiness. He had received various safety awards. (See Whitney Morgan Dep. [DN 210-6] 17-18.) Further, while Mr. Pope suffers from COPD, he had disclosed this condition to the Department of Transportation. (See May 5, 2009 Med. Exam. Report [DN 210-8].) Despite having COPD, Mr. Pope passed his biennial Commercial Driver Fitness Determinations, including one on May 5, 2009—two months before the subject accident. (See id.) Indeed, the Court finds that imposing

punitive damages on Crete would be improper. As to Mr. Pope, there is no pattern of dangerous driving. As such, Crete could not have anticipated such a pattern. As a matter of law, the Defendants are entitled to summary judgment on the Plaintiffs' punitive damages claim against Crete.

## C. EFFECT OF RULING

As noted above, the Defendants have admitted fault for the accident. (Defs.' Mem. [DN 210-2] 8.) This left two main issues to resolve: (1) the amount of compensatory damages to which the Plaintiffs are entitled; and (2) whether the Plaintiffs can recover punitive damages. The Court has held that the Defendants are entitled to summary judgment on the punitive damages issue. Thus, the only remaining issue is the amount of compensatory damages to which the Plaintiffs are entitled. In this respect, the Court finds that the presentation of evidence at trial will be limited to the injuries that the Plaintiffs sustained and the extent of those injuries. There will be no need for the Plaintiffs to present evidence of any alleged negligent training or supervision.

Such a conclusion is supported by case law. Indeed, while Kentucky courts have not directly addressed whether negligent training and supervision claims survive in light of an admission of respondeat superior liability, several courts have done so and have concluded that they do not. Judge Forester explained this issue in Oaks v. Wiley Sanders Truck Lines, Inc., stating:

> Under the doctrine of respondeat superior, an employer may be held vicariously liable for the tortious conduct of an employee if the evidence shows that such conduct was committed while the employee was acting within the scope of his employment. The majority rule is that once an employer has admitted respondeat superior liability for a driver's negligence, it is improper to allow a plaintiff to proceed against an employer on any other theory of imputed negligence. Scroggins v. Yellow Freight Sys., Inc., 98 F. Supp. 2d 928, 931 fn.3 (E.D. Tenn.2000) (applying Georgia law). Once an employer defendant has admitted liability to plaintiff for its employee's negligence, the evidence laboriously submitted to establish the other theory of liability serves no purpose. The energy and time of courts and litigants is unnecessarily expanded. In addition, potentially inflammatory evidence comes into the record which is irrelevant to any contested issue in the case. Once vicarious liability for negligence is admitted under respondeat superior, the person to whom the negligence is imputed becomes strictly liable to the third party for damages attributable to the conduct of the

person from whom negligence is imputed. The liability of the employer is fixed by the amount of liability of the employee.

Here, we have a case where the employer has admitted respondeat superior liability so presentation of evidence to support the negligent hiring, training, retention, supervision and entrustment claims is unnecessary. Allowing the claim for negligent hiring, training, retention, supervision and entrustment to continue would not entitle Plaintiff to greater recovery but would merely prejudice Wiley Sanders. There is an exception to this rule when punitive damages are contested, but no claim for punitive damages exists here, making this exception irrelevant.

2008 WL 5459136, at *1 (E.D. Ky. Nov. 10, 2008). Other courts have reached similar conclusions.

See, e.g., Southard v. Belanger, - F. Supp. 2d -, 2013 WL 4499016 (W.D. Ky. Aug. 29, 2013);

McHaffie v. Bunch, 891 S.W.2d 822, 826 (Mo. 1995) (citing cases); Gant v. L.U. Transp., Inc.,

770 N.E.2d 1155, 1160 (Ill. App. 2002); Lee v. J.B. Hunt Transp., Inc., 308 F. Supp. 2d 310, 313

(S.D.N.Y. 2004); Hackett v. Wash. Metro. Area Transit Authority, 736 F. Supp. 8, 9 (D.D.C. 1990).

The Court agrees with these decisions. Because Crete has admitted respondeat superior

liability, and there is no longer a punitive damages claim, the presentation of evidence to support

the negligent training and supervision claim is unnecessary. Allowing the negligent training and

supervision claim to proceed would serve no purpose other than prejudicing Crete. The

compensatory damages issue is the only issue for trial.

### III. THE DEFENDANTS' MOTION TO EXCLUDE, OR LIMIT TESTIMONY OF, THREE OF THE PLAINTIFFS' EXPERT WITNESSES (DR. THOMSON, DR. CZEISLER, AND MR. MORGAN) [DN 213]

The Plaintiffs have named six experts: (1) Dr. Douglas Thomson, a pulmonologist; (2)

Dr. Charles Czeisler, a sleep expert; (3) Mr. Whitney Morgan, a trucking expert; (4) Dr. Dale

Angerman, a family-medicine doctor; (5) Dr. Brian Beam, a family-medicine doctor; and (6) Ms.

Martha Laska, a licensed professional clinical counselor. (Pls.' Not. of Prod. of Rule 26(a)(2)(B)

Expert Witness Reports [DN 154] 1.) Dr. Angerman, Dr. Beam, and Ms. Laska have treated or

counseled the Plaintiffs. (Id.) The Defendants have moved to exclude, or limit the testimony of,

the Plaintiffs' other expert witnesses: Dr. Thomson, Dr. Czeisler, and Mr. Morgan. When analyzing motions on the admissibility of expert testimony, Fed. R. of Evid. 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the judge acts as a gatekeeper to ensure that expert testimony is both reliable and relevant. Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)).

In this case, the Court finds that the proffered expert testimony of Dr. Thomson, Dr. Czeisler, and Mr. Morgan is irrelevant. Indeed, since the Court has concluded that the trial will be limited to the consideration of compensatory damages, their testimony will be excluded. See Oaks, 2008 WL 5459136, at *1 (dismissing the plaintiff's expert because he was "expected to offer testimony in connection with Plaintiff's negligent hiring, training, retention, supervision and entrustment claim" and the Court had dismissed that claim). Dr. Thomson and Dr. Czeisler have neither treated nor examined the Plaintiffs. Likewise, Mr. Morgan has offered no opinions on the Plaintiffs' damages. Therefore, the Court concludes that their testimony would serve no purpose. While the testimony would certainly be relevant if the question of fault was at issue, it is not. The proffered opinions do not relate to the determination of fair and reasonable compensatory damages. The Defendants' motion to exclude or limit the expert testimony of Dr. Thomson, Dr. Czeisler, and Mr. Morgan is **GRANTED**.

### IV. THE PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL G. EHRIE, JR. [DN 201]

The Plaintiffs have moved to exclude the expert testimony of Dr. Michael G. Ehrie, Jr. Dr. Ehrie is board-certified in pulmonary medicine and sleep medicine. (See Curriculum Vitae of

Michael G. Ehrie, Jr., M.D. [DN 214-1] 2.) In their motion to exclude, the Plaintiffs have argued that Dr. Ehrie should "not be permitted to testify that in his opinion, driver Michael Pope could have passed a DOT-authorized medical examination after being discharged from the hospital." (See Pls.' Brief in Supp. of Mot. to Exclude Speculative Expert Testimony [DN 201-1] 12.)

The Court finds it unnecessary to discuss this argument. Like the proffered expert testimony of Dr. Thomson, Dr. Czeisler, and Mr. Morgan, the proffered testimony of Dr. Ehrie is irrelevant. Since the Court has concluded that the trial will be limited to the consideration of compensatory damages, Dr. Ehrie's testimony will be excluded. Dr. Ehrie did not treat or examine the Plaintiffs. He has offered no opinions on their damages. As such, the Court concludes that his testimony would serve no purpose. The proffered opinions do not relate to the determination of fair and reasonable compensatory damages. The Plaintiffs' motion to exclude the testimony of Dr. Ehrie is **GRANTED**.

## V. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Defendants' Motion for Partial Summary Judgment on the Plaintiffs' Punitive Damages Claims [DN 210] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Exceed Reply-Brief Page Limitation [DN 223] is **GRANTED**.

**FURTHER** that the Defendants' Motion to Exclude, or Limit Testimony of, Three of the Plaintiffs' Expert Witnesses (Dr. Thomson, Dr. Czeisler, and Mr. Morgan) [DN 213] is **GRANTED**.

**FURTHER** that the Plaintiffs' Motion to Exclude the Expert Testimony of Michael G. Ehrie, Jr. [DN 201] is **GRANTED.**

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

November 5, 2013